Filed 7/31/26  Remini v. Church of Scientology International CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LEAH REMINI,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CHURCH OF SCIENTOLOGY INTERNATIONAL et al.,<br><br>    Defendants and Appellants. | B337765<br><br>(Los Angeles County<br>Super. Ct. No. 23STCV18300) |

APPEALS from an order of the Superior Court of Los Angeles County.  Randolph M. Hammock, Judge.  Affirmed in part and reversed in part with directions.

Kasowitz Benson Torres, Daniel A. Saunders and Amit R. Vora for Plaintiff and Appellant.

Horvitz & Levy, Scott P. Dixler, Jasjaap S. Sidhu, Jeremy B. Rosen; Winston & Strawn, William H. Forman, Margaret E. Dayton and Jeffrey L. Steinfeld for Defendant and Appellant Church of Scientology International.

Jeffer Mangels Butler & Mitchell, Robert E. Mangels and Matthew D. Hinks for Defendant and Appellant Religious Technology Center.

Church of Scientology International (CSI) and Religious Technology Center (RTC) (collectively, Defendants) appeal from the partial denial of a special motion to strike (Code Civ. Proc., § 425.16,[1] commonly known as an anti-SLAPP motion).  The trial court struck certain allegations from plaintiff Leah Remini's operative complaint but denied Defendants' anti-SLAPP motion as to other allegations.  Remini cross-appeals from the trial court's order, arguing that select allegations should not have been struck.  We affirm in part and reverse in part with directions.

## BACKGROUND

### The parties

As stated in her complaint, Remini is "a two-time Emmy-award winning producer, actress and New York Times best-selling author."  She starred on the television sitcom *The King of Queens*.  In 2015, she released a memoir, Troublemaker: Surviving Hollywood and Scientology, that was a New York Times bestseller.  From 2016 to 2019, she hosted the television show *Leah Remini: Scientology and the Aftermath*, which she created and produced, and she later hosted a podcast, *Scientology: Fair Game*, which stopped airing in 2022.  Remini states that she was a Scientologist for nearly 40 years, before departing in 2013.

CSI describes itself as a global religion whose members "come from every profession and every walk of life."  CSI is a nonprofit religious corporation incorporated in the State of California, and is considered the " 'Mother Church' of Scientology, the religion founded by L. Ron Hubbard."

RTC describes itself as "a church of the Scientology religion."  In a declaration presented to the trial court, the president of RTC stated that RTC is a nonprofit religious corporation whose "central role and

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

2

function is to ensure the orthodoxy of the Scientology religion worldwide."

**The complaint**

Remini filed this action on August 2, 2023. The operative first amended complaint, filed later that month, set out nine causes of action against Defendants, including claims for defamation, false light, tortious interference with contractual relationship, intentional interference with prospective economic advantage, and declaratory relief.

In the complaint, Remini alleges that Defendants, consistent with their alleged decades-long practice of "institutionaliz[ing] a series of retaliatory activities to be taken against any individual . . . that Scientology deems to be an enemy," "have undertaken a campaign to ruin and destroy [her] life and livelihood." The complaint states that Remini was declared a "suppressive person" (an enemy) by Defendants, and was said to have committed "suppressive acts," which included her public departure from Scientology and becoming "an outspoken public advocate for victims of Scientology." According to Remini, she was made "fair game" by Defendants in 2013, a status that allegedly mandates her "obliteration," and left her "subject to harassment, stalking and other attacks."[2]

Remini's complaint is lengthy, stretching well over 60 pages and 300 separate paragraphs. The complaint's allegations include that Defendants "implemented a mass coordinated social media effort against Ms. Remini to spread false and malicious information about her through hundreds of Scientology-run websites and social media accounts." Defendants allegedly "enlisted dozens of current and former Scientologists to record videotaped messages (in Scientology production

---

[2] The complaint notes that Defendants ceased using the term "fair game" many years ago but alleges that the "fair game" policy continues regardless.

studios) to make disparaging and false claims against Ms. Remini—including false and defamatory statements that she was abusive to her mother and daughter, and that she is a racist," and continue to host these videos on websites they maintain.  One of the people appearing in the videos is Remini's "estranged and now deceased father, George Remini and his third wife, Dana," who allegedly made false and defamatory statements about Remini.  Defendants also allegedly "posted thousands of malicious and harassing tweets" about Remini on the website Twitter,[3] including a fake image of her with an " 'I love rapists' " tattoo.

The complaint additionally alleges that "Defendants' incessant harassment of anyone or any entity affiliated with Ms. Remini has caused Ms. Remini to lose current and prospective business contracts and opportunities."  Remini claims that Defendants interfered with her relationships with companies that aired her podcasts and shows, and caused advertisers to pull their advertisements.  Altogether, the complaint details dozens of alleged defamatory statements and instances of wrongful conduct.

**The anti-SLAPP papers**

Defendants' anti-SLAPP motion, which was jointly filed, sought to strike nearly 100 separate allegations in the complaint, as well as numerous causes of action.  Defendants argued that the challenged allegations arose from protected speech and petitioning activity, and that Remini could not establish a probability of success.

Along with the motion, Defendants submitted the declaration of Lynn R. Farny, a minister of Scientology and a corporate officer of CSI since 1988.  Among other things, Farny's declaration referred to statements by Remini that were critical of Scientology, including a Twitter post that Defendants had committed " 'nefarious and criminal deeds,' " and comments from Remini's podcast that Scientology is "pure

---

[3] Twitter.com (Twitter) has since rebranded to X.com.

fucking evil," and that "[w]hen people say it's like any other religion, shut the fuck up with this. It's nothing like any fucking religion, ever. As soon they become Scientologists, they literally stop thinking for themselves. . . . If you can imagine what Nazi youth are like, that's what you're talking to. You're talking to a robot. It's like you're walking around a bunch of fucking, like, body snatchers." Farny's declaration also referenced numerous statements directly at issue on the anti-SLAPP motion and attached evidence relating to the statements.

Farny's declaration further covered matters of Scientology doctrine. She stated that the " 'Fair Game' policy was canceled in 1968," and that Remini's characterization of Scientology doctrine as including the policy was false. Instead, according to Farny, "When someone is expelled from the religion, they are declared a Suppressive Person. Church doctrine with respect to such people is that neither the Church nor individual Scientologists will have anything to do with them unless and until their status as Suppressive Persons is cancelled."

Remini opposed the anti-SLAPP motion by arguing that the statements at issue in the complaint and motion were personal attacks on Remini and did not constitute protected speech by Defendants. She also asserted that she was likely to prevail on each claim because the statements were defamatory and actionable. In support of her motion, Remini submitted her own declaration addressing numerous allegedly defamatory statements, attesting that the statements were false. Her declaration also detailed what she referred to as a "Harassment Campaign" waged against her by Defendants.

Remini additionally submitted the declaration of Mike Rinder, a friend of hers who had also left Scientology and had since cohosted Remini's Scientology-related television show and podcast. Rinder declared that, prior to leaving CSI in 2007, he served on its board of directors for 25 years, and that he acted as the head of the "Office of Special Affairs" (OSA), which, according to Rinder, "directs

5

investigations and carries out operations against those who speak out against Scientology, or 'Suppressive Persons.' " Rinder stated that he had personal knowledge that Farny's statements about the fair game policy were incorrect because he personally carried out fair game tactics while acting as head of the OSA until 2007. These tactics included using private investigators and others to intimidate targets, falsely accusing targets of crimes, illegally obtaining targets' personal information, confronting targets at home and in public spaces, harassing targets' family and friends, and online harassment. According to Rinder, while use of the term "Fair Game" stopped in 1968, the policy continued to the present day.

CSI submitted additional declarations concurrent with its reply papers.

At an initial hearing on the motion, the trial court continued the matter and gave RTC and Remini leave to file additional briefing and declarations pertaining to the relationship between CSI and RTC, and whether RTC potentially could be jointly liable or whether CSI was alone responsible for the alleged defamation at issue.

Remini filed a supplemental declaration of Rinder, as well as a declaration by Claire Headley, who declared that she worked for RTC for eight years until 2004. Both Rinder and Headley declared that RTC, as a matter of course, was the entity that directed the operations intended to silence and intimidate perceived enemies of CSI.

RTC's supplemental brief argued that the Rinder and Headley declarations were not admissible to prove that RTC was responsible for the alleged defamation and other conduct at issue in the anti-SLAPP motion. RTC submitted the declaration of Warren McShane, a director of RTC since 1983 and its president since 1993. McShane declared that RTC is a separate and distinct entity from CSI, with its own directors, officers, facilities, and finances. McShane's declaration stated that RTC did not make or publish any of the statements upon which

6

Remini's complaint was based and that were at issue in the anti-SLAPP motion.

**The final trial court order**

After several hearings, the trial court issued its final order on the anti-SLAPP motion in March 2024. The court overruled all objections to the numerous declarations submitted by the parties.

The trial court noted that the multitude of claims alleged in the complaint were "hard to keep track of" and pleaded in a " 'shotgun' " style, but analyzed each of the individual allegations at issue regardless. The court found that the bulk of the allegations identified in the anti-SLAPP motion constituted speech and/or petitioning activity made in connection with an issue of public interest.[4]

The trial court then turned to Remini's probability of prevailing on her claims. The court, in its order, found that a number of allegations upon which claims were based were barred by the statute of limitations, and therefore struck those allegations. The court additionally found that other allegations were not actionable because, among other reasons, the statements involved opinion rather than asserted fact, were too vague or general in meaning, or were not actually made by Defendants. Based on these findings, the trial court struck from the complaint approximately half of the nearly 100 allegations at issue on the anti-SLAPP motion.

With respect to the remaining allegations, the trial court concluded that Remini is a "public figure," and thus was required to make a prima facie showing that Defendants' statements were made with actual malice. The court, treating the evidence Remini submitted as true, found that Remini met her burden—which, at this early stage

---

[4] On appeal, defendants do not challenge the trial court's ruling that certain allegations—relating to surveillance of Remini and her associates—did not meet this standard of protected activity.

7

of the proceedings, was comparatively minimal—of demonstrating that Defendants acted with malice.

The trial court further denied the anti-SLAPP motion inasmuch as it sought to strike certain causes of action. The court did strike, however, Remini's declaratory relief claim.

Finally, with respect to RTC's argument that it was not individually responsible for the alleged defamatory statements and other conduct, the trial court noted that the parties submitted conflicting evidence on the role and actions of RTC. Because the court, in ruling on the anti-SLAPP motion, accepted Remini's evidence as true and did not weigh the strength of the evidence, it concluded that Remini met her burden in establishing that RTC was a proper defendant.

Defendants filed timely notices of appeal. Remini timely cross-appealed.

## DISCUSSION

### I.    General anti-SLAPP standards

Section 425.16 provides for a "special motion to strike" when a plaintiff asserts claims against a person "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).) Such claims must be stricken "unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (*Ibid.*)

The court's ruling on an anti-SLAPP motion entails a two-step procedure. First, the "moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396 (*Baral*).) If the defendant makes such a showing, at the second step the "burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually

8

substantiated." (*Ibid*.) Without resolving evidentiary conflicts, the court determines "whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment." (*Ibid*.)

We review de novo a trial court order granting or denying an anti-SLAPP motion. (*Key v. Tyler* (2019) 34 Cal.App.5th 505, 515.)

## II. The first step

### A. *Procedural framework*

At step one of the anti-SLAPP analysis, "the focus is on determining what 'the defendant's activity [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.' " (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1063 (*Park*).) At this stage, we primarily examine the defendant's conduct, not the defendant's alleged motive. (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 888 (*Wilson*).) The court must " 'consider the elements of the challenged claim and what *actions* by the defendant supply those elements and consequently form the basis for liability.' " (*Id*. at p. 887.) The defendant's burden is to "identify what acts each challenged claim rests on and to show how those acts are protected under a statutorily defined category of protected activity." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009 (*Bonni*).)

A claim is not always synonymous with a cause of action under this approach. Thus, if a cause of action is based only in part on protected conduct, the cause of action itself is not properly stricken. (*Pechkis v. Trustees of California State University* (2026) 119 Cal.App.5th 497, 501 (*Pechkis*).) Rather, the focus is on the acts, or claims, pleaded in the complaint and whether they are protected. (*Bonni, supra,* 11 Cal.5th at p. 1009.) "[C]ourts should analyze each claim for relief—each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected and, if so, whether the claim

they give rise to has the requisite degree of merit to survive the motion." (*Id.* at p. 1010.) Unprotected acts are "disregarded." (*Baral, supra,* 1 Cal.5th at p. 396.)

When a defendant takes a " 'surgical approach' " in an anti-SLAPP motion, it should do so " 'by identifying, in the initial motion, each numbered paragraph or sentence in the complaint that comprises a challenged claim and explaining "the claim's elements, the actions alleged to establish those elements, and wh[y] those actions are protected." ' " (*Pechkis, supra,* 119 Cal.App.5th at 505.) This was the approach taken by Defendants in this matter, and accordingly the trial court order analyzed each of the many challenged statements. (See *Balla v. Hall* (2021) 59 Cal.App.5th 652, 672 (*Balla*) [examining "each publication, recognizing some issues will be common to some or all".])

At the first stage of the anti-SLAPP inquiry, " 'the question is only whether a defendant has made out a prima facie case that activity underlying a plaintiff's claims is statutorily protected [citations], not whether it has shown its acts are ultimately lawful.' [Citation.] 'If the acts alleged in support of the plaintiff's claim are of the sort protected by the anti-SLAPP statute, then anti-SLAPP protections apply.' " (*Billauer v. Escobar-Eck* (2023) 88 Cal.App.5th 953, 963 (*Billauer*).)

### B. *Public issues and issues of public interest*

Section 425.16, subdivision (e) defines the categories of acts that are in " 'furtherance of a person's right of petition or free speech' " and accorded protection. Two categories apply in this case: "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest," and "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(3)–(4).) "Conduct," as referenced in section 425.16, subdivision (e)(4), includes "oral or written statements." (*Wilson, supra,* 7 Cal.5th at p. 899.)

10

The determination of whether speech qualifies as a public issue or an issue of public interest involves yet another two-step process. (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 149 (*FilmOn*).)  First, we look "to the content of the speech" in determining what, if any, public issue or issue of public interest is implicated. (*Ibid.*)  Statements implicating a public issue "generally 'concern[] a person or entity in the public eye[,] . . . conduct that could directly affect a large number of people beyond the direct participants[,] . . . or a topic of widespread, public interest,' " while an issue of public interest includes an issue " 'of concern to a substantial number of people' " or one that has " 'been the subject of extensive media coverage.' " (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1248 (*Geiser*).)  Second, we determine whether the target statement contributed to the "public discussion of the issue." (*Id.* at p. 1249.)  In doing so, we consider the context, "including audience, speaker, and purpose." (*FilmOn,* at p. 152.) Statements "too tenuously tethered to the issues of public interest they implicate, and too remotely connected to the public conversation about those issues," do not merit protection.  (*Id.* at p. 140.)

### C.  *Defendants made a sufficient first-step showing*

As argued by the parties and considered by the trial court, the bulk of the allegations at issue on the anti-SLAPP motion—and particularly those at issue in this appeal—were principally relevant to Remini's cause of action for defamation, though at least some also supported other causes of action.  A defamation cause of action lies for "the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or that causes special damage." (*Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 486 (*Grenier*).)

Many of the allegations at issue involved allegedly false statements made by Defendants on the Internet, either on Twitter or on websites maintained by Defendants.  These allegations included statements that Remini was "abusive to her mother and daughter"; "is

11

a liar," "has no morals," and "only wanted her name in the news"; "would not help to pay for [her father's] cancer treatments"; "turned her back on her half-sister when she was in the hospital"; "ransacked her dying grandmother's apartment"; "abus[ed] family members"; that her "rap sheet" includes "inciting hate—from vandalism to murder"; and that she filed a "false police report and then attempt[ed] to extort Scientology." The anti-SLAPP motion also targeted allegations that Defendants waged a harassment campaign against companies involved with Remini's podcast, causing the show to lose advertisers and eventually cease production.

The trial court did not err in finding that Defendants met their burden of making a prima facie showing that the statements and conduct at issue in these allegations were protected under the anti-SLAPP statute.[5] (See *Billauer, supra,* 88 Cal.App.5th at p. 963 [only a prima facie showing is necessary at this stage].) Defendants' alleged online statements were made " 'in a place open to the public or a public forum' " within the meaning of section 425.16, subdivision (e)(3). (*Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1252 (*Jackson*) [" 'Web sites accessible to the public . . . are "public forums" for purposes of the anti-SLAPP statute' "].) And, as asserted by Defendants, their communications with advertisers and producers sufficiently met the standard of "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech" under section 425.16, subdivision (e)(4). (See *Environmental Planning & Information Council v. Superior Court* (1984) 36 Cal.3d 188, 191–195 (*Environmental Planning*) [newsletter advising readers not to patronize a newspaper's advertisers protected by constitutional right of free speech].)

---

[5] As previously noted, defendants do not challenge the trial court's ruling that certain allegations did not constitute protected activity.

12

Remini argues on appeal that Defendants failed to demonstrate that the statements and conduct involved a "public issue" or an "issue of public interest" under section 425.16, subdivision (e)(3) and (4). Statements regarding a person " 'in the public eye,' " however, generally are considered to concern a public issue (see *Geiser, supra,* 13 Cal.5th at p. 1248), and, at least as the matters have been framed, Remini counts as such a person. Remini describes herself in the complaint as "a two-time Emmy-award winning producer, actress and New York Times best-selling author." Based on her life in the spotlight, we can reasonably assume that Remini is a person in the public eye. Indeed, Remini's complaint leaves little room for doubt, as the complaint expressly describes Remini as a "public figure." (See *Medical Marijuana, Inc. v. ProjectCBD.com* (2020) 46 Cal.App.5th 869, 883 (*ProjectCBD*) [issues on anti-SLAPP motion are framed by the pleadings].)

The broader context of the challenged statements is another reason that at least some of the statements involved a public issue or issue of public interest. Defendants' statements critical of Remini cannot be viewed in isolation. Rather, Remini actively participated in making her dispute with Scientology into a matter of public concern, through her book, television show, and podcast. Given this background, the parties' trading of insults itself implicated a public issue. (See *Jackson, supra,* 10 Cal.App.5th at p. 1254 ["high profile" individuals' critical postings and comments about their relationship was " 'celebrity gossip' " and thus a public issue or issue of public interest].)

Remini argues that Defendants' statements do not touch upon a matter of public concern because they involve highly personal subjects, such as her relationships with family members. The first step of identifying a public issue, however, "is satisfied so long as the challenged speech or conduct, considered in light of its context, may reasonably be understood to implicate a public issue, even if it also

13

implicates a private dispute." (*Geiser, supra,* 13 Cal.5th at p. 1253; see also *FilmOn, supra*, 7 Cal.5th at p. 149 ["if the social media era has taught us anything, it is that speech is rarely 'about' any single issue"].) Given the highly public nature of the parties' dispute, the challenged allegations implicate, at least in part, a public issue. Moreover, Remini does not contest the finding that Defendants' alleged communications with businesses regarding her shows—communications that concerned the shows themselves—involved a public issue.

Remini additionally argues that, even if an issue of public interest is present, Defendants cannot satisfy the nexus requirement of the first step's second prong. To satisfy this standard, a statement must contribute to the "public discussion of the issue" (*Geiser, supra*, 13 Cal.5th at p. 1249) and must not be "too tenuously tethered to the issues of public interest they implicate" (*FilmOn, supra,* 7 Cal.5th at p. 140).

Remini fails to show error. Defendants made statements in a public forum—the Internet—regarding a public figure. At least some of those statements concerned Remini's contentious relationship with Scientology, which itself is a public issue. Although it is possible that some statements—those that simply aired private details of Remini's personal life with no apparent purpose but revenge—could be found, in the abstract, not to meet the second prong of the first test (see *Grenier, supra,* 234 Cal.App.4th at p. 482 ["private information is not turned into a matter of public interest simply by its communication to a large number of people"]), Remini does not focus on those statements in her papers. Instead, Remini takes an all-or-nothing approach to the step one analysis and does not attempt to argue that individual allegations fail.

Viewing the subject allegations in their entirety, it can only be concluded that they, at least in part, contributed to the public debate by furthering the discourse on the public issue of Remini and her relationship with Scientology, whether for good or bad. (See *FilmOn,*

14

*supra*, 7 Cal.5th 150–151.)  "We are not concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction; rather, we examine whether a defendant—through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest."  (*Id.* at p. 151.)  Thus, given that at least some allegations survive the first step, Remini fails to demonstrate that the trial court erred by concluding that Defendants made a prima facie showing sufficient to meet their first-step burden.  (See *Billauer, supra*, 88 Cal.App.5th at p. 969 [appellate court presumes trial court's order is correct and appellant must demonstrate error].)

## III.   The second step

### A.   *Procedural standards*

At step two of the anti-SLAPP analysis, "the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated."  (*Baral, supra*, 1 Cal.5th at p. 396.)  The court considers the pleadings as well as evidence submitted by the parties.  (*Mitchell v. Twin Galaxies, LLC* (2021) 70 Cal.App.5th 207, 217 (*Mitchell*).  The plaintiff's " 'proof must be made upon competent, admissible evidence.' "  (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 940 (*Sweetwater*).)  The plaintiff's overall burden, however, is a "limited one," requiring only a demonstration of " 'minimal merit.' "  (*Wilson, supra,* 7 Cal.5th at p. 891.)

The second step involves a " 'summary judgment-like procedure.' [Citation.]  The court does not weigh evidence or resolve conflicting factual claims.  Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment.  It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law."  (*Baral, supra,* 1 Cal.5th at pp. 384–385, fn. omitted.)  Conflicts in the evidence

15

(i.e., disputed issues of material fact) require denial of the anti-SLAPP motion as to associated claims. (*Billauer, supra,* 88 Cal.App.5th at p. 965.) " '[C]laims with the requisite minimal merit may proceed.' " (*Baral*, at p. 385.)

As with the first step analysis, each distinct claim is examined to determine whether the plaintiff has met the second-step burden. (*Jackson, supra,* 10 Cal.App.5th at p. 1256.)

**B.** ***Viability of allegations raised in the direct appeal***

In its consideration of the second step, the trial court struck certain allegations based on findings that Remini's allegations either (i) could not support liability as a matter of law, or (ii) were not supported by sufficient evidence. The court declined to strike other allegations, however, and CSI (joined by RTC) challenges the trial court's rulings as to many of these claims. We examine each of these challenged allegations individually.

As noted previously, most of the allegations relate primarily to Remini's defamation cause of action,[6] which requires a defendant's "intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or that causes special damage." (*Grenier, supra,* 234 Cal.App.4th at p. 486.) Although republication of defamatory statements is privileged in certain situations as defined by statute, California has adopted the common law rule that "one who republishes a defamatory statement is deemed thereby to have adopted it and so may be held liable, together with the person who originated the statement, for resulting injury to the reputation of the defamation victim." (*Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th 254, 268.) Several principles shape how we

---

[6] As explained below, some challenged allegations are more relevant to other causes of action, such as tortious interference with contractual relationship or intentional interference with prospective economic advantage.

16

determine whether a statement supports an actionable defamation claim.**7**

A provably false assertion of fact is necessary. (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112 (*McGarry*).) Mere statements of opinion that do "not contain a provably false factual connotation" are not actionable. (*Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 20 [110 S.Ct. 2695, 111 L.Ed.2d 1] (*Milkovich*).) The applicable inquiry is " 'whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact.' " (*McGarry*, at p. 113.) Falsity is not established if " 'the imputation is substantially true so as to justify the "gist or sting" of the remark.' " (*ProjectCBD, supra,* 46 Cal.App.5th at p. 884.) At this early stage of the proceedings, the element of falsity need only be demonstrated by a preponderance of the evidence. (*Mitchell, supra,* 70 Cal.App.5th at p. 218.)

The tenor of the statement is also assessed. Statements of " ' " 'rhetorical hyperbole,' 'vigorous epithet[s],' 'lusty and imaginative expression[s] of . . . contempt,' and language used 'in a loose, figurative sense' have all been accorded constitutional protection." ' " (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1048 (*Nygard*).) As the Supreme Court has observed, " 'Speech is often provocative and challenging.' (*Terminiello v. Chicago* (1949) 337 U.S. 1, 4 [93 L.Ed. 1131, 69 S.Ct. 894].) But our legal tradition recognizes the importance of speech and other expressive activity even when—perhaps especially when—it is uncomfortable or inconvenient." (*Geiser, supra,* 13 Cal.5th 1238, 1256.)

---

**7** We address the requirement of actual malice as it pertains to a public figure in a following section of the opinion.

1.      *Paragraph 90:  Remini was "abusive to her mother and daughter."*

Defendants argue that this allegation should have been struck by the trial court because Remini failed to show that defendants actually made or republished the statement.  Defendants are correct.

Remini's complaint does not explain where or when Defendants used the quoted language and her opposition to the anti-SLAPP motion contains no evidence that the statement ever occurred.  " '[T]he general rule is that the words constituting an alleged libel must be specifically identified, if not pleaded verbatim, in the complaint.' " (*ProjectCBD, supra,* 46 Cal.App.5th at p. 893, italics omitted.)  The plaintiff's burden in opposing an anti-SLAPP motion is to "demonstrate the *falsity of specific statements*."  (*Id.* at p. 892.)  One element of a defamation claim is that the defendant "made" the statement.  (CACI Nos. 1700–1705; see also *Matson v. Dvorak* (1995) 40 Cal.App.4th 539, 549 ["The general rule for defamation is that only one 'who takes a *responsible* part in the publication is liable for the defamation' "].)

Although it is true that "slander can be charged by alleging the substance of the defamatory statement," due in part to a defendant often having superior knowledge of the facts (*Okun v. Superior Court* (1981) 29 Cal.3d 442, 458), those considerations are not present here.  The allegation that Defendants made or republished the statement that Remini "was abusive to her mother and daughter" came, according to the complaint, from videos posted on the Internet.  Remini had access to the cited videos but still did not identify, in her opposition to the anti-SLAPP motion, how, when, where, or by whom the statement was made.  Moreover, and more important, she did not verify that the statement occurred.  Simply put, Defendants cannot be required to defend themselves against unsubstantiated allegations.  (See (*Baral, supra*, 1 Cal.5th at p. 396 [claim must be "factually substantiated"].)

18

2. *Paragraph 91: Remini "is a liar," "has no morals," and "only wanted her name in the news"*

As relevant to this claim, the complaint alleges, in pertinent part: "Defendants also used and manipulated Ms. Remini's estranged and now deceased father, George Remini and his third wife, Dana, to make false statements about Ms. Remini, including that she is a liar, that she only wanted her name in the news, . . . and that she has no morals. These false statements were posted to websites created and controlled by Defendants and continue to be promoted or reposted by Scientology."

On appeal, Remini does not argue that two of the allegations are actionable: that she " 'has no morals' " and that she "only wanted her name in the news." Remini correctly asserts, however, that the remainder of the allegation should not be struck. It is well established that calling someone a "liar" can constitute actionable defamation. (*Milkovich, supra,* 497 U.S. at pp. 19–20 [explaining that the statement, " 'In my opinion Mayor Jones is a liar,' " is actionable]; see also *Dickinson v. Cosby* (2017) 17 Cal.App.5th 655, 685 (*Dickinson*) [accord].) Remini met her minimal burden in opposing the anti-SLAPP motion by submitting evidence tending to show that this statement was untrue.

3. *Paragraph 91: Remini "would not help to pay for [her father's] cancer treatments"*

CSI states in its brief that this allegation refers to a statement made by Remini's father that Remini refused to pay for a cancer biopsy, which was contained in a video posted on a Scientology website. In opposing the anti-SLAPP motion, Remini additionally submitted a copy of a Twitter post by Defendants that stated "she would not help pay for [her father's] cancer tests," and which linked to the video of her father.

Remini met her burden of making a prima facie evidentiary showing substantiating this claim. In opposing the anti-SLAPP motion, Remini submitted a declaration stating that she paid for her father's cancer treatments and informed Scientology that she was doing

19

so. At a minimum, there is a conflict in the evidence as to whether the statements made by Remini's father in the video and by Defendants on Twitter were false, requiring denial of the anti-SLAPP motion as to this allegation. (See *Billauer, supra,* 88 Cal.App.5th at p. 965.)

>    4.    *Paragraph 91: Remini "turned her back on her half-sister when she was in the hospital"*

Remini's complaint did not plead this statement verbatim. The actual statement, published on a Scientology website, was that Remini "turn[ed] her back on her dying half-sister, Stephani, and Stephani's pleas for financial help." The allegation, however, sufficiently identified the statement at issue, and Defendants were able to and did respond to the actual language. (See *ProjectCBD, supra,* 46 Cal.App.5th at p. 893 [" 'alleged libel *must be specifically identified, if not pleaded verbatim*' "].)

Defendants argue that the statement is mere rhetorical hyperbole and incapable of being proved true. We disagree. "Turn one's back on" is defined as "reject [or] deny" or "forsake."[8] Remini could demonstrate, for example, that she provided financial or emotional support for her half sister while she was dying. Indeed, in her declaration, Remini stated that she paid for many of her half sister's hospital bills as well as her funeral.

Nevertheless, the trial court properly struck this allegation as falling outside the one-year statute of limitations for defamation. (Code Civ. Proc., § 340, subd. (c) [one year statute of limitations for libel and slander].) Remini acknowledges that the interview statement was first published on a Scientology-maintained website in 2017. Remini argues that the statement was republished in July 2023, but the evidence submitted by Remini only shows that, in July 2023, Defendants posted

---

[8] (See Merriam-Webster Dict. Online (2026) <https://www.merriam-webster.com/dictionary/turn%20one's%20back%20on> [as of July 24, 2026], archived at <https://perma.cc/L9ZN-LZFD>.)

a link on Twitter to the same Scientology website. This bare link to a website, with no indication that it had anything to do with the relationship between Remini and her half sister, did not serve to restart the limitations period. (See *Penrose Hill, Ltd. v. Mabray* (N.D.Cal. 2020) 479 F.Supp.3d 840, 852 (*Penrose Hill*) [merely linking to an article does not amount to republication]; *Lokhova v. Halper* (4th Cir. 2021) 995 F.3d 134, 143 [accord].)

5. *Paragraph 91: Remini "ransacked her dying grandmother's apartment."*

This statement also originated from a family member and was published on a Scientology website. Defendants argue that is not a provably false assertion of fact. It is: "Ransack" means "to look through thoroughly in often a rough way" or "to search through and steal from in a forceful and damaging way."[9]

Defendants also argue that the statement is corroborated by other family members, who said that Remini directed her sister to take everything from her grandmother's apartment. Remini, however, declares that the incident never occurred. We do not weigh credibility or resolve evidentiary conflicts at this stage. (*Baral, supra,* 1 Cal.5th at pp. 384–385.)

6. *Paragraph 105: tweets that Remini's "rap sheet" includes various offenses*

Defendants' challenge to paragraph 105, as stated in its opening brief and repeated here, does not accurately quote the Twitter post that Defendants seek to strike. The Twitter post, which was copied directly into Remini's complaint, was from a Scientology-affiliated account and stated that Remini's "rap sheet includes attempted bribery, tampering with justice, and inciting hate—from vandalism to murder."

---

[9] (See Merriam-Webster Dict. Online (2026) <https:/www.merriam-webster.com/dictionary/ransack> [as of July 24, 2026], archived at <https://perma.cc/JJ3S-2WTA>.)

21

Defendants argue that the Twitter post should be struck from the complaint because the statement is not a provably false assertion of fact but instead is merely rhetorical hyperbole and loose and figurative language. We disagree. A reasonable fact finder could conclude that the statement declares or implies a statement of fact. (See *McGarry, supra,* 154 Cal.App.4th at p. 113.) A "rap sheet" is a term commonly used to refer to a person's criminal information history, including prior convictions. (See e.g., *All of Us or None–Riverside Chapter v. Hamrick* (2021) 64 Cal.App.5th 751, 765, fn. 15; *People v. Dunlap* (1993) 18 Cal.App.4th 1468, 1471; *Hill v. Superior Court of Los Angeles County* (1974) 10 Cal.3d 812, 817.) "False statements that accuse the plaintiff of criminal conduct are defamatory on their face." (*Grenier, supra,* 234 Cal.App.4th at p. 486.) The statement that Remini has a rap sheet, which ostensibly includes convictions or at least past charges for numerous acts of wrongdoing, is a matter that can be understood as a statement of fact and one that can be proven true or false.

Defendants argue that the setting in which the statement was made, Twitter, confirms its rhetorical nature. A related argument—premised on the assertion that " ' "online blogs and message boards are places where readers expect to see strongly worded opinions rather than objective facts" ' "—was rejected in *Balla, supra,* 59 Cal.App.5th at page 682. As the court in *Balla* observed, even if the appellant's premise was accepted, "online speech can still be defamatory." (*Ibid.*) A similar analysis applies here. Even accepting as true Defendants' argument that the "setting" in which the statement was made may cause one to expect " ' "epithets, fiery rhetoric or hyperbole" ' " (citing *Dickinson, supra*, 17 Cal.App.5th at p. 687), there is no conclusive indication that Defendants' post was intended to be read as hyperbole or satire rather than an assertion of fact.

22

7. *Paragraph 115:  article titles*

Scientology-affiliated websites published articles with the titles "Leah Remini: A One-Woman Hate Machine" and "Leah Remini Told Dying Sister 'Get Charity Care,' Family Says."

On appeal, Remini does not dispute that the first title does not constitute actionable defamation.  As to the second title, Remini failed to submit evidence in opposition to the anti-SLAPP motion demonstrating that it was untrue.  These allegations, therefore, are properly ordered stricken from the complaint.

8. *Paragraph 119:  Remini is an " 'unhinged religious bigot' " and a "Disgrace to Women of Valor Everywhere."*

Remini concedes that these statements, which appeared on a Scientology website, are not actionable and should be stricken.

9. *Paragraph 120:  Remini filed a " 'false police report and then attempt[ed] to extort Scientology.' "*

This language again refers to a statement appearing on a Scientology website.  In connection with their moving papers, Defendants submitted evidence explaining the context of the allegation. Remini filed with the police a missing person report regarding a prominent figure in Scientology.  The Los Angeles Police Department investigated the report, determined that the subject was not missing or in harm's way, and deemed the report unfounded.  Then, after Defendants contacted a media outlet accusing Remini of filing a false police report, Remini, through counsel, sent demand letters to CSI accusing it of defamation and seeking up to $1 million in compensation. In opposing the anti-SLAPP motion, Remini did not deny that her missing person report was deemed unfounded or that her lawyers sent letters demanding compensation for alleged defamation related to the incident.

Although Defendants could have chosen more appropriate words than "false" and "extort" in describing these incidents, their strained

23

use of language does not give rise to a viable defamation claim. Language that is "used 'in a loose, figurative sense' " is properly accorded protection. (*Nygard, supra,* 159 Cal.App.4th at p. 1048.) Likewise, language that reflects " 'one of a number of possible rational interpretations' of an event" is covered under the First Amendment. (*Bose Corp. v. Consumers Union* (1984) 466 U.S. 485, 512 [104 S.Ct. 1949, 80 L.Ed.2d 502] (*Bose*).) Defendants' statements possibly exaggerated and overdramatized the events, but Remini failed to demonstrate that they were false, actionable statements of fact. Accordingly, the allegation should have been stricken from the complaint.

> 10. *Paragraph 120: Remini "abus[ed] family members, including her half-sister, Stephani, and father, George Remini."*

This allegation appears to be a summary of related statements rather than a statement actually made or republished by Defendants. Remini's complaint contains allegations that she was wrongly accused of treating family members in an uncaring way, but it does not identify where or when any statement that she "abus[ed]" her half sister or her father was made. Moreover, the evidence submitted in opposition to the anti-SLAPP motion does not explain or substantiate the allegation that the statement was made.

The complaint in this respect thus fails to sufficiently identify an actual alleged defamatory statement. (See *ProjectCBD, supra,* 46 Cal.App.5th at p. 893.) Further, given that the term "abuse" can span a range of meanings, the allegation as made is incapable of being proven true or false. A trier of fact could not be expected to determine what kind of "abuse" Remini was accused of when that term was not actually used. Although the term could be actionable depending on context (e.g., if the defendant stated the plaintiff "abused her relatives, resulting in physical and/or emotional trauma") there was no such allegation or

24

evidence here.  The allegation therefore should have been struck.  (See *Baral, supra*, 1 Cal.5th at p. 396.)

> 11.  *Paragraph 120:  article titled "Leah Remini to Dying Sister: 'Get Charity Care.' "*

As already noted with respect to a nearly identical allegation, Remini did not submit evidence tending to show that this alleged statement was untrue.  The allegation therefore should have been stricken.

> 12.  *Paragraph 127:  Remini's daughter "left 'her toxic home life' " because Remini " 'called her . . . a cunt all the time.' "*

Defendants argue that this allegation should have been struck because the statement that Remini's daughter "left her toxic home life" is rhetorical hyperbole and has no definite meaning capable of being proven true or false.

If that were the entirety of the allegation, we would be inclined to agree.  But the allegation states that Remini's daughter "left her toxic home life" *because* Remini "called her a cunt all the time."  In opposing the anti-SLAPP motion, Remini submitted evidence of the actual post from which this language was taken.  It read substantially the same as the allegation, stating that the "real reason" Remini's daughter left "her toxic home life" was that Remini " 'called her daughter a c--t all the time.' "

Reading the statement as a whole, whether Remini's daughter left a toxic home because she was often called a specific highly vulgar obscenity is a matter that is capable of being proved true or false.  And Remini met her burden of demonstrating minimal merit to the claim by declaring that the statement was "absolutely untrue."

13. *Paragraph 127 (tweet from Phil Maasen) and footnote 35 of paragraph 129 (list of Twitter accounts allegedly controlled by Church)*

The cited portion of paragraph 127 that Defendants challenge contains a verbatim, offensive Twitter post by a man, Phil Maasen, who the complaint refers to as a Scientologist. Defendants correctly argue that they cannot be liable for a statement that they did not make or republish. (See CACI Nos. 1700–1705; *Baral, supra,* 1 Cal.5th at p. 396.) This allegation thus should have been stricken.

On the other hand, footnote 35 to paragraph 129 simply lists a number of Twitter accounts allegedly "controlled and/or directed by Defendants or persons working for Defendants." This footnote is not properly challengeable on the anti-SLAPP motion because it does not encompass a protected statement and does not form a potential basis for liability. (See *Wilson, supra,* 7 Cal.5th at p. 888.) " '[M]erely incidental' " or " 'collateral' " assertions "are not subject to section 425.16," and "[a]llegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Baral, supra,* 1 Cal.5th at p. 394.)

14. *Paragraph 136: Remini uses "obscenity-laced and abusive language, to insult, defame and demean Scientologists."*

Remini does not dispute that this statement, which appeared on a website maintained by Defendants, is not actionable and must be stricken.

15. *Paragraph 148: " 'Remini obviously agrees . . . "it's not a big deal" to sexually abuse women.' "*

This allegation from the complaint does not accurately reflect the statement to which it refers. The actual statement—which appeared in an article posted on a Scientology website regarding Remini's association with two men accused of sexual abuse—was: "Remini obviously agrees with the actions of these men or feels that 'it's not a

big deal' to sexually abuse women, because if she felt otherwise, she would cease associating with them."

Defendants correctly assert that this statement is not actionable. As is evident from the language used, the statement reflects the author's opinion that a person who cared about sexual abuse would not continue associating with the men at issue. This vague rhetoric is not capable of being proven true or false, and whether the author's opinion is correct or not is a matter of no consequence. Even if incorrect, the statement reflects " 'one of a number of possible rational interpretations' of an event" and cannot form the basis of a defamation or related claim. (See *Bose, supra,* 466 U.S. at p. 512.)

16. *Paragraph 150: Twitter post about advertisers pulling ads from gameshow and embedded image*

Copied into Remini's complaint were a Twitter post and a related graphic, both originally posted on Twitter by Defendants, that referenced *People Puzzler*, a television gameshow hosted by Remini. The text of the post stated: "Another advertiser has cancelled their ads on People Puzzler—the . . . program hosted by antireligious bigot . . . Remini. This marks the 5th advertiser to cancel Remini." This particular post is not actionable. The phrase "antireligious bigot" is mere rhetoric, and Remini did not present evidence refuting the assertion that five advertisers had canceled advertisements on the show. This allegation (the copied post) therefore should have been struck.

The related graphic, however, is actionable. The graphic includes five photos of Remini inside circles with diagonal lines (the universal "prohibited" sign). In the background, at least 13 widely recognized corporate logos are present. As the trial court correctly observed, the "gist" or "sting" of the image was that "a wave of high-profile advertisers—including all of those expressly listed—had withdrawn their advertising on [Remini's] show. . . . Why else would Defendants include logos of specific brands unless they intended viewers to believe

that those very brands had withdrawn support for the show?" (See *ProjectCBD, supra,* 46 Cal.App.5th at p. 884 [falsity can be established if gist or sting of remark is not substantially true].) Moreover, Remini's declaration stated that the image's apparent message—that each of these companies had withdrawn advertisements—was incorrect. Accordingly, she met her burden of demonstrating minimal merit as to this graphic.

> 17. *Paragraphs 137, 142-146, 250-251, and 263-264: activity directed toward business relationships*

Paragraph 137 details steps taken by Defendants in an attempt to influence the company airing Remini's podcast. The paragraph summarizes an article published on a Scientology website as follows: "Defendants openly admit that they called and emailed iHeartMedia's executive vice president and chief communications officer, producer, and the podcast audio editor in an attempt to prevent Ms. Remini's podcast from airing." Paragraphs 142–145 detail letters and other communications from Defendants to Audioboom Limited, the advertising sales representative for Remini's podcast, and related communications. In these communications, Defendants, among other things, criticized " 'syndicating the hate podcast of two rabid anti-Scientologists,' " " 'reached out to companies to inform them this was the defamation and bigotry they were paying for through their advertising,' " called the podcast content " 'dehumanizing [and] hateful,' " confirmed that certain advertisements were no longer running, requested that other advertisers " 'pull your advertising from this platform,' " and urged an investor to " 'do something about its syndication of hate.' "

These paragraphs (137 and 142–145) fit squarely within section 425.16, subdivision (e)'s protections. Although they might have been aggressive in nature, they are protected speech and do not support a viable cause of action. Much of the subject speech, such as referring to Remini as a " 'rabid anti-Scientologist' " and describing the podcast as

28

" 'dehumanizing [and] hateful,' " is nonactionable rhetorical hyperbole. (See *Nygard, supra,* 159 Cal.App.4th at p. 1048.) The communications also would have been understood by recipients as an obvious attempt by Defendants " ' "to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole." ' " (*Dickinson, supra,* 17 Cal.App.5th at p. 687.) Moreover, the communications—urging entities to stop airing content that Defendants vehemently disagreed with and that related to a matter of public interest—constituted protected protest or boycott activity under the First Amendment. (See *Environmental Planning, supra,* 36 Cal.3d at pp. 191–195 [newsletter advising readers not to patronize a newspaper's advertisers was protected free speech]; see also *Geiser, supra,* 13 Cal.5th at p. 1250 [protest outside a business executive's home implicated a public issue].) Remini does not make a showing that the communications are actionable, and accordingly these paragraphs must be struck.

On the other hand, paragraph 146 primarily provides context regarding the termination of Remini's contract with Audioboom Limited. As such, it is not properly struck in these anti-SLAPP proceedings. (See *Baral, supra,* 1 Cal.5th at p. 394 [anti-SLAPP procedure does not cover allegations that merely provide context].) Likewise, paragraphs 250–251 and 263–264, respectively, primarily provide context and meet general pleading requirements for Remini's tortious interference with contractual relationship and intentional interference with prospective economic advantage causes of action. These causes of action are supported by other conduct not challenged on appeal. The paragraphs are therefore not properly subject to Defendants' motion to strike. (See *ibid.*)

C. ***Actual malice***

To prove defamation, a plaintiff who is a "public figure" "must show, by clear and convincing evidence, that the defamatory statement was made with actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false." (*Mitchell, supra,* 70

29

Cal.App.5th at p. 218; see also *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 256 (*Reader's Digest*) [accord].) " '[P]ublic figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. [¶] . . . [¶] [More important,] . . . public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them. No such assumption is justified with respect to a private individual.' " (*Milkovich, supra,* 497 U.S. at p. 15.)

As noted previously, Remini's complaint not only elaborates on her career as an actress, author, and television and podcast host, as well as the numerous public accolades associated with her work; it also specifically refers to Remini as a "public figure." We accept this description as true and accordingly consider Remini's showing under the applicable standard. (See *ProjectCBD, supra,* 46 Cal.App.5th at p. 883 [issues on anti-SLAPP motion are framed by the pleadings].)

Actual malice may be proven by either direct or circumstantial evidence. (*Reader's Digest, supra,* 37 Cal.3d at p. 258; *Balla, supra,* 59 Cal.App.5th at p. 683.) "The existence of actual malice turns on the defendant's subjective belief as to the truthfulness of the allegedly false statement." (*Mitchell, supra,* 70 Cal.App.5th at p. 221.) "Factors such as failure to investigate, anger and hostility, and reliance on sources known to be unreliable or biased 'may, in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication.' (*Reader's Digest, supra,* 37 Cal.3d at pp. 257-258.) However, any one of these factors, standing alone, may be insufficient to prove actual malice or raise a triable issue of fact. (*Id.* at p. 258.)" (*Mitchell, supra,* 70 Cal.App.5th at p. 221.) In opposing a special motion to strike, "defamation plaintiffs need not establish malice by clear and convincing evidence. Rather, they must meet their minimal burden by introducing sufficient facts to establish a prima facie case of actual malice." (*Collins v. Waters* (2023) 92 Cal.App.5th 70, 80; see also

*OneTaste Inc. v. Netflix, Inc.* (2025) 116 Cal.App.5th 174, 188 (*OneTaste*) [on anti-SLAPP motion, "a public figure plaintiff must demonstrate a probability that it can produce clear and convincing evidence of actual malice"].)

In *Mitchell, supra,* an inference of actual malice was demonstrated when the plaintiff presented evidence tending to show that the defendant relied on biased sources and failed to investigate, despite pleas that it do so, in stating that the plaintiff's record-high video game scores were faked. (70 Cal.App.5th at pp. 221–223.) The defendant asserted that its evidence showed it held a good faith belief in its statements. (*Id.* at p. 223.) The court observed that this "competing evidence" was insufficient to defeat the plaintiff's claim of actual malice because the court could "not weigh the credibility or comparative probative strength of competing evidence." (*Ibid.*) Instead, the court's review was limited to whether the defendant's evidence demonstrated that the plaintiff could not prevail as a matter of law. (*Id.* at pp. 223–224.)

In this case, in opposing the anti-SLAPP motion, Remini submitted declarations and other evidence that, when viewed in their entirety, were sufficient to establish a prima facie case that Defendants' alleged defamatory statements were made with actual malice. Remini's own declaration stated that she was deemed a suppressive person by Scientology in 2013, and it detailed the alleged coordinated harassment and character assassination she had suffered since that time. Her declaration stated that Defendants enlisted dozens of Scientologists, including her father and his wife, to make disparaging and false statements about her. Defendants then disseminated these statements by posting them online. According to Remini's declaration, Defendants were informed that some of the statements were untrue but republished them anyway. Further, Defendants did not ask Remini about the truthfulness of the statements. Defendants' alleged harassment of Remini purportedly

31

extended to having her followed and surveilled, as well as face-to-face harassment of Remini, family members, and associates as directed by Defendants.  According to Remini, the alleged harassment continued after she filed this lawsuit.

Rinder's declaration, also submitted in opposition to the anti-SLAPP motion, provided further context and support for these representations.  Rinder laid a foundation by explaining that he joined Scientology's Sea Organization in 1973, which "consists of the most dedicated Scientologists who commit to serving Scientology for a billion years" and "occupy the most senior positions in the hierarchical structure of Scientology and thus control all its activities around the world."  He became Scientology's international spokesperson, served on CSI's board of directors for 25 years, and was head of the OSA for more than 20 years.  Rinder declared that the OSA "directs investigations and carries out operations against those who speak out against Scientology, or 'Suppressive Persons.' "  According to Rinder, OSA's tactics "include the type of character assassination, stalking, and harassment that Leah Remini . . . [has] been subjected to for many years."

Rinder's declaration also described numerous directives Scientology published beginning in the 1950's, including what Rinder referred to as the " 'Fair Game' " policy.  Rinder stated that "[o]ne method Scientology uses to 'restrain[] and muzzle[]' a Suppressive Person is to financially ruin that person by attacking their sources of income."  As noted previously, Rinder said that Defendants will hire private investigators to intimidate targets, falsely accuse targets of crimes, confront targets at home and in public spaces, harass targets' family and friends, and engage in online harassment, all with the goal of "destroy[ing] Scientology's enemies at any cost."  Rinder also detailed numerous instances of alleged harassment that he had suffered since leaving Scientology in 2007.  Finally, Rinder declared that "the social media attacks and other assaults against Leah Remini are precisely the

type of actions that RTC directs," and that these actions were undertaken by Defendants in a coordinated fashion.

Although "anger and hostility" toward an alleged victim of defamation is not always sufficient to establish actual malice (*Mitchell, supra,* 70 Cal.App.5th at p. 221), given the extensive evidence of Defendants' hostility toward Remini, and the many documented alleged acts that appeared to be calculated to avenge that hostility, the factor weighs heavily in this case. As in *Balla, supra,* "hostility is relevant if it reflects on the publisher's attitude toward the truth of the statements [citation], and it does so here." (59 Cal. App. 5th at p. 684.)

Remini's evidence tends to demonstrate an established pattern and practice of deliberate attacks by Defendants (and those directed by Defendants) intended to sully the reputations of perceived opponents, which includes the dissemination of defamatory statements. Remini presents evidence that she was deemed a suppressive person, and that she was accordingly targeted. She makes a prima facie showing that Defendants, at a minimum, acted with reckless disregard in publishing statements about which they harbored serious doubts, which Remini has sufficiently shown were false. Indeed, a reasonable inference is that Defendants intentionally published false statements about Remini *because* of their hostility toward her. While Defendants attempt to counter this evidentiary showing with evidence of their own, this simply illustrates that the evidence is disputed, which is not enough for Defendants to prevail on their anti-SLAPP motion. (*Mitchell, supra,* 70 Cal.App.5th at pp. 223–224.)

Again, at this stage of the case, we are required to accept Remini's evidence as true. (*Baral, supra,* 1 Cal.5th at pp. 384–385.) Defendants objected to Remini's evidence in the trial court but their objections were overruled, and they do not renew most of these objections (as they apply to the malice issue) on appeal. (See *White v. Smule, Inc.* (2022) 75 Cal.App.5th 346, 353, fn. 2 [proponent must renew and argue objections to preserve them on appeal].)

33

CSI, in its reply brief, does advance a First Amendment objection to Remini's evidence of malice based on the principle that "[s]tate courts must not decide questions of religious doctrine; those are for the church to resolve." (*Episcopal Church Cases* (2009) 45 Cal.4th 467, 473; see also *Our Lady of Guadalupe Sch. v. Morrissey-Berru* (2020) 591 U.S. 732 [140 S.Ct. 2049, 207 L.Ed.2d 870]; *Presbyterian Church in United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church* (1969) 393 U.S. 440 [89 S.Ct. 601, 21 L.Ed.2d 658].) CSI contends that Remini's interpretation of Defendants' conduct, as supported by the Rinder declaration, is based upon an assessment of Scientology religious doctrine. CSI argues that it submitted contrary evidence of church doctrine, and to resolve the issue would require the court to invade upon Scientology's role in determining issues of church doctrine.

CSI failed to raise the issue here until its reply, even though it ostensibly pertains to the direct appeal. "We do not consider arguments raised for the first time in reply." (*OneTaste, supra,* 116 Cal.App.5th at p. 188, fn. 6.)

In any event, although Rinder's declaration does touch upon possible issues of religious doctrine, Remini's evidence of malice does not appear to rest on religious doctrine, at least to a significant extent. Rather, the bulk of the evidence pertains to custom, practice, and conduct. Rinder, based on his experience as head of the OSA, described "tactics" employed by Defendants that included "character assassination, stalking, and harassment." It does not require any doctrinal interpretation to determine whether such tactics were commonly used against perceived enemies. Further, Remini's declaration describing an alleged far-reaching and frequent harassment campaign, tending to demonstrate long-held hostility toward her, does not rely on questions of religious doctrine.

Indeed, in their reply papers below, Defendants expressly rejected making any claim that "tortious conduct is not actionable if it

34

was religiously motivated." Nor could they. (See *Ohno v. Yasuma* (9th Cir. 2013) 723 F.3d 984, 1006-1007 ["The Religion Clause protections 'embrace[] two concepts—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be.' [Citations.] Conduct, including speech-based conduct such as solicitation, 'remains subject to regulation for the protection of society.' [Citation.] So recognizing, California courts have entertained claims of fraud, undue influence, and intentional infliction of emotional distress brought against religious entities by former members seeking recovery of donations and damages for harm"].) Thus, Defendants are unable to defeat Remini's showing of actual malice by invoking the First Amendment rule of religious doctrine abstention.

## IV. The trial court correctly declined to dismiss RTC

### A. *Background*

As the trial court noted in its final order, Defendants RTC and CSI filed their anti-SLAPP motion jointly. In the moving papers, RTC made no attempt to argue that it was differently situated than CSI in terms of potential liability. Then, in a single sentence in their reply, Defendants argued that Remini "provide[d] no evidence that defendant RTC made or was the source of any of the alleged defamatory statements in the FAC."

Rather than treating RTC's argument as forfeited, the trial court gave RTC and Remini the opportunity to file additional briefing and evidence pertaining to the relationship between CSI and RTC, and whether RTC potentially could be jointly liable for the alleged defamation at issue.

Remini filed a supplemental declaration of Rinder, as well as a declaration by Claire Headley, who declared that she worked for RTC for eight years until 2004. Both Rinder and Headley declared that, based on their experience, RTC was the entity that directed operations used to silence and intimidate perceived Scientology enemies. In addition to relating matters from her personal experience, Headley, in

her declaration, attached and explained pages from RTC's current website that described RTC's tasks as including "to help locate hidden suppression, infiltration, subversion or corruption," and described "matters of RTC concern" as including "[a]ny suppressive act against Scientology," "[a]ny person who is hypercritical of Scientology," "[p]ublicly departing Scientology," and "[p]ublic statements against Scientology."

Rinder, in turn, declared that RTC is "in charge of" OSA, which he previously headed. He further stated that "[a] primary function of RTC is to ensure that Scientology directives, including 'battle tactics' and other instructions for attacking those speaking out against Scientology, are properly executed. Based on my experience, the social media attacks and other assaults against Leah Remini are precisely the type of actions that RTC directs." Additionally, Rinder declared that "Scientology, and specifically RTC through OSA, disseminates its attacks on 'enemies' (suppressive persons) through numerous online social media accounts," and that "in my experience, all of those accounts are directed by RTC through OSA."

RTC lodged objections to the Rinder and Headley declarations and, in a supplemental brief, argued that the Rinder and Headley declarations were not admissible to demonstrate potential RTC liability. Additionally, RTC submitted the declaration of McShane, the long-time director and president of RTC. As noted previously, McShane declared that RTC is a separate and distinct entity from CSI, with its own directors, officers, facilities, and finances. McShane further stated that Headley mischaracterized the RTC website, asserting that the information therein "simply represents RTC's fact gathering role as part of its ultimate mission of ensuring the orthodoxy of the Scientology religion." McShane continued, "I can unequivocally state that RTC neither made nor published any of the statements alleged in the [complaint] on which Plaintiff sues." McShane then

recited individual allegations of the complaint, declaring that RTC did not make or publish the statements at issue.

In its final order, the trial court overruled all objections to the declarations. The court concluded that, because the parties submitted conflicting evidence on the role and actions of RTC, Remini met her burden in establishing that RTC was a proper defendant.

## B.    *Analysis*

RTC argues that the Rinder and Headley declarations were inadmissible to prove its involvement in the statements and conduct at issue. RTC contends that the evidence provided by Rinder and Headley was not the sort that could be properly introduced at trial and so could not serve to meet Remini's burden in opposing the anti-SLAPP motion. Noting that Rinder and Headley left Scientology well prior to making their declarations, RTC asserts that the declarations are not based on personal knowledge. RTC also asserts that the evidence contained in the declarations constitutes improper propensity or character evidence, and should have been excluded under Evidence Code section 1101. According to RTC, there is no admissible evidence that it published or caused the publication of the statements at issue, and no admissible evidence that it authorized or directed others to publish the statements.

In *Sweetwater, supra,* our Supreme Court reiterated that "evidence may be considered at the anti-SLAPP motion stage if it is reasonably possible the evidence set out in supporting affidavits, declarations or their equivalent will be admissible at trial." (*Id.,* 6 Cal.5th at p. 947.) On the other hand, evidence relying on " 'the sort of evidentiary problem a plaintiff will be incapable of curing by the time of trial' " cannot be considered. (*Id*. at p. 948.) As the court explained in assessing the admissibility of a declaration or similar document: "To clarify the distinction, the *written statements themselves* need not be admissible at trial, but it must be reasonably possible that the *facts asserted* in those statements can be established by admissible evidence

37

at trial." (*Id.* at p. 948, fn. 12.) "[I]f the evidence relied upon *cannot* be admitted at trial, because it is categorically barred or undisputed factual circumstances show inadmissibility, the court may not consider it in the face of an objection." (*Id.* at p. 949; see also *Sanchez v. Bezos* (2022) 80 Cal.App.5th 750, 774–776 [excluding evidence from a declaration relying on double hearsay because it was not reasonably possible it would be admissible at trial].)

RTC is thus correct that, if the declarations submitted by Remini demonstrating RTC's involvement were based upon evidence that could never properly be admitted at trial, then the anti-SLAPP motion should have been granted in RTC's favor. (See *Contreras v. Dowling* (2016) 5 Cal.App.5th 394, 416 [plaintiff on anti-SLAPP motion must provide evidentiary support for allegations]; see also CACI Nos. 1700–1705, *supra*; *Matson v. Dvorak, supra,* 40 Cal.App.4th at p. 549 [defendant in defamation action generally must be responsible for publication].) RTC does not attempt to argue that Remini's evidence was insufficient to establish its involvement as to any particular allegation. Instead, RTC contends that the entirety of the evidence of its alleged involvement, as proffered through the Rinder and Headley declarations, was based on evidence that would not be admissible at trial, and therefore should have been excluded for purposes of the anti-SLAPP motion. We " 'review the trial court's evidentiary rulings for an abuse of discretion.' " (*Klem v. Access Ins. Co.* (2017) 17 Cal.App.5th 595, 606; see also *Ghadrdan v. Gorabi* (2010) 182 Cal.App.4th 416, 420 [reviewing ruling on Evidence Code section 1101 objection for abuse of discretion]; *Preciado v. Freightliner Custom Chassis Corp.* (2023) 87 Cal.App.5th 964, 974 [reviewing lack of personal knowledge ruling for abuse of discretion].)

We conclude that the trial court did not abuse its discretion in overruling RTC's objections to the Headley and Rinder declarations. Evidence Code section 1101, subdivision (a) generally prohibits "evidence of a person's character or a trait of his or her character

38

(whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) . . . when offered to prove his or her conduct on a specified occasion." Evidence Code section 1101, subdivision (b), on the other hand, allows for the introduction of evidence that a person "committed a . . . civil wrong, or other act when relevant to prove some fact"—including "intent," "knowledge," and "identity"—"other than his or her disposition to commit such an act."

The trial court in this matter could reasonably conclude that the evidence provided by Rinder and Headley was admissible under Evidence Code section 1101, subdivision (b) as relevant to prove RTC's intent in allegedly spreading defamatory statements, RTC's knowledge that this was occurring, and RTC's identity as an entity responsible for doing so. Rinder and Headley declared that RTC routinely directed such activities against perceived enemies of Scientology in accordance with defined practices, as set out in their declarations and supporting materials. "[A] plaintiff may establish a claim by showing either that the acts that harmed him were knowingly committed or were engaged in with such frequency as to indicate a general business practice." (*Colonial Life & Accident Ins. Co. v. Superior Court* (1982) 31 Cal.3d 785, 791.) The evidence of RTC's alleged established methods of engaging in defamatory campaigns against so-called suppressive persons was (according to the declarations) a frequent, general practice, and was thus admissible under Evidence Code section 1101, subdivision (b) to show intent, knowledge, and identity, not for its tendency to prove "disposition to commit such an act."

The trial court could also determine that the evidence was admissible under Evidence Code section 1105, which provides: "Any otherwise admissible evidence of habit or custom is admissible to prove conduct on a specified occasion in conformity with the habit or custom." The "hallmark of admissibility" under both Evidence Code sections 1101, subdivision (b) and 1105 is "similitude of the prior and present conduct." (*Holdgrafer v. Unocal Corp.* (2008) 160 Cal.App.4th 907,

929.) The Rinder and Headley declarations both described policies of retribution—accomplished, among other ways, by "social media attacks"—that matched the wrongs allegedly suffered by Remini.

In *Marshall v. Brown* (1983) 141 Cal.App.3d 408, which involved a lawsuit against a former employer for wrongful interference with prospective employment, a former managerial employee testified that he was instructed to give bad recommendations about former employees. (*Id.* at p. 416.) The appellate court found that the "thrust" of the witness's testimony "was to establish defendant's policy of giving bad recommendations," and that it should not be excluded as character evidence. (*Ibid.*) "Instead, the testimony was properly admissible under Evidence Code section 1105, allowing evidence of habit or custom to prove conduct on a specified occasion." (*Ibid.*) Rinder and Headley's declarations likewise described asserted policies followed as a matter of practice by RTC. The content of the declarations thus was appropriately admissible as evidence of habit or custom.

The trial court could also properly determine that Headley and Rinder had the requisite personal knowledge to support the evidence presented in their declarations. "[T]he testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter." (Evid. Code, § 702, subd. (a).) "A witness' personal knowledge of a matter may be shown by any otherwise admissible evidence, including his own testimony." (*Id.*, subd. (b).) The trial court's admission of a declaration as based on personal knowledge is reviewed for abuse of discretion. (*Preciado v. Freightliner Custom Chassis Corp., supra,* 87 Cal.App.5th at p. 974.)

Both Headley's and Rinder's declarations contain substantial evidence to support a finding that they had personal knowledge of the matters set forth in the declarations. Headley declared that she worked for RTC, during which time she worked directly for the chairman, for eight years. She outlined the type of conduct she routinely witnessed at RTC. Rinder declared that he acted as the head

of OSA, and that RTC is "in charge of" OSA. He further described his knowledge of how RTC "disseminates its attacks" through OSA.

Although both Headley and Rinder left their positions well prior to providing the declarations in this matter—Headley in 2004 and Rinder in 2007—that fact alone did not make their declarations inadmissible. The primary substantive content of both declarations focused on alleged long-established practices that the declarants were personally familiar with, which, they asserted, matched the wrongs allegedly experienced by Remini. RTC disputed the claim that such practices exist, but that simply raises a disputed issue of fact, which cannot support an order granting an anti-SLAPP motion. (See *Billauer, supra,* 88 Cal.App.5th at p. 965.) While Rinder's and Headley's lack of recent experience may weigh on their credibility, it does not render their evidence necessarily barred or per se inadmissible. (See *Sweetwater, supra,* 6 Cal.5th at p. 949.) Accordingly, the trial court did not abuse its discretion in considering the declarations. (See *Tutti Mangia Italian Grill, Inc. v. American Textile Maintenance Co.* (2011) 197 Cal.App.4th 733, 742 [declarations that made "clear that the declarants had actual personal knowledge" should have been admitted].)

In sum, RTC fails to demonstrate that the evidence contained in the Rinder and Headley declarations is "categorically barred" or that "undisputed factual circumstances show inadmissibility." (See *Sweetwater, supra,* 6 Cal.5th at p. 949.) Since it is reasonably possible that the evidence will be admissible at trial (see *id.* at p. 947), the declarations were properly considered by the trial court in concluding that RTC remains potentially liable for the alleged defamatory statements and other conduct surviving the anti-SLAPP motion.

## V.     Remini's cross-appeal

### A.     *Specific allegations addressed in cross-appeal*

In her cross-appeal, Remini challenges the trial court's order with respect to its striking of numerous allegations. Since we have already

determined that Defendants met their first-step anti-SLAPP burden, we analyze whether Remini meets her second-step burden by sufficiently "demonstrat[ing] that each challenged claim based on protected activity is legally sufficient and factually substantiated." (*Baral, supra*, 1 Cal.5th at p. 396.)

1. *Paragraphs 129, 177, 178, 273, 283: Statements accusing Remini of incitement*

Five statements are at issue in this challenge. First, Defendants posted on Twitter that Remini "is obsessed with inciting violence against Scientology. Hundreds of threats and acts of violence were caused by her now cancelled TV show, podcast and her tweets—even the murder of a member." Second, Defendants issued a statement asserting that Remini's statements had "generated threats of and actual violence against the Church and its members as evidenced by multiple criminal convictions of individuals poisoned by Remini's propaganda." Third, Defendants posted on Twitter: "Leah Remini has incited over 600 individual incidents against #Scientology including specific threats to assassinate the leader of the religion, acts of criminal assault, vandalism, arson, bomb threats and other violence. #FactsMatter." Fourth and fifth, Defendants posted on a Scientology-maintained website and on Twitter, respectively, the statements: "In 2019, a man incited by Leah Remini's hate speech murdered a 24-year-old Scientologist, Aaron Yeh, outside the Australasian headquarters of the Church," and " 'On January 3, 2019, a man incited by Leah Remini's hate speech murdered a 24-year-old Scientologist. [Remini] has blood on her hands.' "

The trial court found that "[t]hese statements are not provably false statements of fact. What it means to 'incite violence,' 'bigotry,' or 'hate,' or to praise criminal conduct, is simply too vague to be proven true." We agree.

Remini argues that Defendants accused her of a crime by stating that she incited violence. She cites *Brandenburg v. Ohio* (1969) 395

U.S. 444 [89 S.Ct. 1827, 23 L.Ed.2d 430] for the proposition that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." (*Id.* at p. 447.)

When viewing the statements at issue, an ordinary reader would not reflect back on a United States Supreme Court case from 1969 to conclude that Remini committed the relatively obscure crime of incitement. Rather, the statements referring to incitement are " ' " 'rhetorical hyperbole' " ' " with " 'too many generalizations, elastic terms, and elements of subjectivity to be susceptible of proof or disproof.' " (*Nygard, supra,* 159 Cal.App.4th at pp. 1049, 1050.) "The 'pertinent question' is whether a 'reasonable fact finder' could conclude that the statements 'as a whole, or any of its parts, directly made or sufficiently implied a false assertion of defamatory *fact* that tended to injure' plaintiff's reputation." (*Issa v. Applegate* (2019) 31 Cal.App.5th 689, 703.) "[C]ourts look to the words of the statement itself and the context in which the statement was made." (*Ibid.*) " ' "For words to be defamatory, they must be understood in a defamatory sense." ' " (*Ibid.*)

The context in which the word "incite" was used by Defendants does not connote a criminal act by Remini. Instead, an ordinary reader would read the statements in a more straightforward manner, understanding them as meaning (according to Defendants) that Remini's words inspired hateful acts or that she created a climate of hate. Whether Remini's public criticism of Scientology could have led others to act is a matter beyond proof. Unlike the assertion that Remini has a "rap sheet," which may cause a reader to believe that she has a criminal history, statements that she "is obsessed with inciting violence," that her speech had "generated threats of and actual violence," and that she "has blood on her hands" are merely examples of rhetorical hyperbole. (See *Nygard, supra,* 159 Cal.App.4th at p. 1050.)

43

These statements are not subject to disproof, and regardless of their exaggerative and inflammatory nature, they are nonactionable. (See *ibid.*; *Milkovich, supra,* 497 U.S. at p. 20.)

2. *Paragraphs 103, 104, 119, 273, 283: Statements accusing Remini of causing religious violence*

The statements at issue here are similar to the previous ones. The allegations relate to accusations that Remini "caus[ed]" a man to throw a rock through a window at a Scientology office, refer to an article title questioning whether Remini is responsible for a " 'Wave of Violence' " against Jehovah's Witnesses' church buildings, and focus on Defendants' Internet posts that Remini's " 'hate speech has resulted in violent and deadly attacks on innocents,' " that she is " 'responsible for hundreds of threats and multiple acts of violent hate crime against Scientologists,' " and that her " 'series generated unprecedented waves of hate and threats against Scientologists, the Church and its leadership . . . and/or her TV show and its incendiary bigotry, including threats of bombings, arson, assassinations and mass murder.' "

The allegation that Remini caused a man to throw a rock through a window does not appear to be based on any statement present in the record. Although an article on a Scientology-related website stated that a man was "stirred up" by Remini into throwing a hammer through a window after Remini appeared on a television program, the complaint's allegation is too divorced from the evidentiary record to support a valid claim. There is no evidence that Remini was accused of "causing" the man to throw a "rock" through a window, and therefore the statement is incapable of proof. (See CACI Nos. 1700–1705 [defendant must have "made" the statement]; see also *ProjectCBD, supra,* 46 Cal.App.5th at p. 893 [must specifically identify defamatory words].)

The separate article title at issue was: "Are Leah Remini and A&E Responsible for the Wave of Violence Against the Jehovah's Witnesses' Kingdom Halls?" The article appeared on a Scientology

44

website. The contents of the article referred to violent acts against Jehovah's Witnesses' church buildings and assertions that Remini had criticized the religion. Although the premise of the article may be outlandish, the title questioning Remini's possible responsibility for attacks does not contain a provably false assertion of fact.[10] Again, it is vague rhetoric and its meaning is elastic. (See *Nygard, supra,* 159 Cal.App.4th at p. 1050.)

The remaining allegations, at paragraphs 273 and 283, are likewise incapable of proof. Similar to the statements that Remini incited violence, the assertions that her criticisms "resulted in" attacks, that she is "responsible" for "hate crime," and that her series "generated hate" are "too vague to be capable of being proven true or false." (See *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 811.)

### 3. *Paragraph 127: Statement that Remini trained her daughter to beat little girls*

This allegation refers to a Twitter post by Defendants stating that Remini "trains her daughter to beat little girls." The statement appears to be a misrepresentation by Defendants of comments that Remini made on a talk show about how she told her daughter to "[b]eat the crap out of" a bully, although this is not made clear by the record.

Defendants' statement, viewed in the abstract, could be actionable, since whether Remini trained her daughter to beat little girls is an assertion of fact that could possibly be proven true or untrue. The trial court properly struck the allegation, however, because Remini failed to meet her burden in opposing the anti-SLAPP motion. Rather than meeting her minimal burden of making a prima facie showing

---

[10] Because we find that the subject allegations in paragraphs 103, 104, and 119 were properly struck, we do not address Remini's contention that these allegations were timely under the statute of limitations. The trial court's statute of limitations rulings and the parties' corresponding arguments are addressed only where necessary.

that the statement was false (see *Mitchell, supra,* 70 Cal.App.5th at p. 218), Remini merely declared that the statement was "unsubstantiated." An assertion being "substantiated," at least in the anti-SLAPP context, is a matter of proof. (*Baral, supra,* 1 Cal.5th at p. 396.) A defamation claim relies on the element of falsity, not lack of evidence for the statement. (*Grenier, supra,* 234 Cal.App.4th at p. 486.) Remini's assertion that Defendants' statement was "unsubstantiated," therefore, was simply not good enough.

4. *Paragraph 148: Statement that Remini is a " 'rape Apologist' "*

This allegation refers to the title of an article, " 'Game Show Network Employs a Rape Apologist as Their Host?,' " referencing a gameshow hosted by Remini. The article was posted on a website maintained by Defendants. Similar to the statement that Remini feels " 'it's not a big deal to sexually abuse women,' " the article referred to Remini's association with two men accused of sexual abuse.

The assertion that Remini is a "rape apologist" is not actionable. Again, while the message may be abhorrent, it is too vague to be capable of proof. Instead, the statement is aptly characterized as " ' " 'rhetorical hyperbole,' [a] 'vigorous epithet,' [a] 'lusty and imaginative expression[] of . . . contempt,' and language used 'in a loose, figurative sense.' " ' " (*Nygard, supra,* 159 Cal.App.4th at p. 1048.)

5. *Paragraph 152: Statements that Remini was abusive in the workplace*

The allegation in the complaint reads: "Defendants also sent OSA operatives claiming to be journalists to the set of [Remini's gameshow], asking producers about 'claims' that Ms. Remini is allegedly abusive in the workplace." The trial court found that this allegation was time-barred. Remini does not address this finding on appeal and thus fails to demonstrate reversible error. (See *Billauer, supra*, 88 Cal.App.5th at p. 969 [appellant must show error].)

**B.** *Allegations pertinent to statute of limitations ruling*

Certain allegations addressed in the direct appeal which we have determined are putatively actionable were found by the trial court to be barred by the statute of limitations, at least insofar as they supported Remini's defamation-related causes of action, which have a one-year limitations period. (Code Civ. Proc., § 340, subd. (c).) As noted above, the defamation claim based on the statement that Remini "turned her back on her half-sister when she was in the hospital" was not brought in a timely manner.

The allegation appeared in paragraph 91 of the complaint. The trial court, however, struck the entirety of paragraph 91 on statute of limitations grounds. This ruling was incorrect, because (as argued by Remini in her cross-appeal) certain statements in the paragraph at issue were republished by Defendants within one year of the August 2, 2023 filing of this action.

"The single-publication rule limits tort claims premised on mass communications to a single cause of action that accrues upon the first publication of the communication, thereby 'spar[ing] the courts from litigation of stale claims' where an offending book or magazine is resold years later." (*Roberts v. McAfee, Inc.* (9th Cir. 2011) 660 F.3d 1156, 1166–1167.) "In print and on the internet, statements are generally considered 'published' when they are first made available to the public." (*Yeager v. Bowlin* (9th Cir. 2012) 693 F.3d 1076, 1081–1082.) However, "[u]nder the single-publication rule, the statute of limitations is reset when a statement is republished." (*Id.* at p. 1082.) That is, "a new cause of action for defamation arises each time the defamer 'repeats or recirculates his or her original remarks to a new audience.' " (*Hebrew Academy of San Francisco v. Goldman* (2007) 42 Cal.4th 883, 891.)

In the context of the Internet, "under California law, a statement on a website is not republished unless the statement itself is substantively altered or added to, or the website is directed to a new audience." (*Yeager, supra,* 693 F.3d at p. 1082.) Pertinent here, a

47

Twitter post that repeats allegedly defamatory statements from another website "constitutes a republication of those statements." (*Penrose Hill, supra,* 479 F.Supp.3d at p. 853.)

Under these guidelines, the claim based on the statement by Remini's father that Remini is a "liar" was timely brought. Although a video of Remini's father making the statement was originally published on a Scientology-maintained website in early 2022, Defendants republished the statement in December 2022 when they posted the video in an embedded form on a different, more conspicuous website, Twitter. This new publication of the video on Twitter constituted a republication. (See *Yeager, supra,* 693 F.3d at p. 1082 [directed to new audience]; *Penrose Hill, supra,* 479 F.Supp.3d at p. 853 [repeating statements on Twitter is republication].)

So too with the statements in paragraph 91 that Remini "would not help to pay for [her father's] cancer treatments" and "ransacked her dying grandmother's apartment." In August 2023, Defendants posted on Twitter that Remini "would not help pay for [her father's] cancer tests," and linked to the video of her father speaking on the matter. Also in August 2023, Defendants posted a graphic on Twitter containing a photo of Remini with the caption " 'ransacked her dying grandmother's apartment.' " Neither of these republications occurred prior to one year before the initiation of this action. Accordingly, these allegations should not have been struck.

### C.     *Remini's declaratory relief claim*

Remini's ninth cause of action for declaratory relief states that she "is in doubt as to her rights and privileges with respect to the crimes and torts being committed against her by Defendants," she "seeks a judicial declaration that the practice of Suppressive Persons operations are unlawful and should be ceased immediately," and she "requests that the Court enter a declaratory judgment that Defendants be prohibited from implementing the Suppressive Persons attack policy."

48

The trial court struck this cause of action, ruling "it is difficult to imagine this court could issue a declaration within the confines of the constitution. At the same time, the declaration Plaintiff seeks is effectively already encompassed by the relief she seeks in her other eight causes of action." The court continued, "It is unclear what practical effect a 'declaration' might have in this case. It goes without saying that courts need not issue declarations simply telling parties to obey the law."

Remini fails to demonstrate that the trial court erred in striking her declaratory relief cause of action. " '[A]n anti-SLAPP motion may lie against a complaint for declaratory relief [citation] . . . .' [Citation.] '[T]he mere existence of a controversy is insufficient to overcome an anti-SLAPP motion against a claim for declaratory relief. [¶] To defeat an anti-SLAPP motion, the plaintiff must also make a prima facie evidentiary showing to sustain a judgment in the plaintiff's favor. [Citation.] In other words, for a declaratory relief action to survive an anti-SLAPP motion, the plaintiff must introduce substantial evidence that would support a judgment of relief made in the plaintiff's favor.' " (*Mission Springs Water Dist. v. Verjil* (2013) 218 Cal.App.4th 892, 909.) Fundamentally, the plaintiff must " ' "state[] and substantiate[] a legally sufficient claim." ' " (*Sweetwater, supra,* 6 Cal.5th at p. 943.)

As recognized by the trial court, the scope of available relief sought by Remini is covered by the numerous other causes of action pleaded in her complaint. Under section 1061, a court may refuse to grant declaratory relief "in any case where its declaration or determination is not necessary or proper at the time under all the circumstances." As a matter of general course, "an action in declaratory relief will not lie to determine an issue which can be determined in the underlying tort action." (*California Ins. Guarantee Assn. v. Superior Court* (1991) 231 Cal.App.3d 1617, 1623.) A declaratory relief claim that is "merely duplicative" of another cause of

49

action may be struck at the pleading stage.  (See *Mendoza v. JPMorgan Chase Bank, N.A.* (2016) 6 Cal.App.5th 802, 820.)

Remini's complaint does not specifically define the "Suppressive Persons operations" or "Suppressive Persons attack policy" that she requests be judicially declared unlawful.  Her other eight causes of action, however, appear to target the activity of which she complains.  For example, her first cause of action, for civil harassment, is aimed at a litany of wrongs, including alleged "following, surveilling, and stalking Plaintiff, sending Scientology operatives to break into Ms. Remini's gated community, stealing her personal residential mail, vandalizing her mailbox, planting and/or attempting to plant spyware in close proximity to her home, sending harassing correspondence to Plaintiff and to others, including business associates and sponsors regarding Plaintiff, and creating a social media smear campaign against Plaintiff that includes false and malicious accusations made against Ms. Remini, and at times, her family."  Her second cause of action, for stalking, describes "being physically harassed and surveilled by private investigators (through their lawyers), private citizens, and OSA members of Scientology at the behest of Defendants" and "posting threatening information to various websites and via social media on a continuing basis."  She additionally states claims for intentional infliction of emotional distress based on Defendants' alleged conduct, for intentional interference with contract and prospective economic advantage relating to her business relationships, for defamation (as already discussed at length), and for false light.  Given the extent of Remini's allegations and claims, it is not apparent that any addressable conduct could be reached by the declaratory relief claim that is not encompassed within these other causes of action.

Further, to the extent, if any, that the potential scope of the declaratory relief claim goes beyond other causes of action, Remini fails to show that such relief would be properly awardable.  If the declaratory relief claim targets future speech not yet judicially

50

determined to be defamatory, that remedy would presumptively run afoul of the principle that " '[t]he attempt to enjoin the initial distribution of a defamatory matter meets several barriers, the most impervious being the constitutional prohibitions against prior restraints on free speech and press.' " (*Balboa Island Village Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1158.)

In any event, just what further relief Remini might seek through her declaratory relief claim is utterly unclear, a factor which, in itself, renders the claim uncertain and ineffective. " '[D]eclaratory relief is appropriate only where there is an actual controversy, not simply an abstract or academic dispute. [Citations.] For purposes of declaratory relief, an "actual controversy" is one which ". . . 'admits of definitive and conclusive relief by judgment within the field of judicial administration, as distinguished from an advisory opinion upon a particular or hypothetical state of facts. The judgment must decree, not suggest, what the parties may or may not do.' " ' " (*Committee for Sound Water & Land Development v. City of Seaside* (2022) 79 Cal.App.5th 389, 408.)

Accordingly, because Remini failed to demonstrate that she stated and substantiated a legally sufficient declaratory relief claim, the trial court properly struck the cause of action. (See *Sweetwater, supra,* 6 Cal.5th at p. 943.)

### D. *Leave to amend is not procedurally available at this stage*

Finally, Remini argues that this matter should be remanded with directions to allow her to amend her complaint so that she can meet her burden on the second step of the anti-SLAPP procedure.

Remini's request contravenes the overwhelming weight of authority on the issue. " 'A plaintiff cannot avoid [an anti-]SLAPP motion by amending the complaint.' " (*Jackson, supra,* 10 Cal.App.5th at p. 1263, quoting *Hansen v. Department of Corrections & Rehabilitation* (2008) 171 Cal.App.4th 1537, 1547; see also *ProjectCBD, supra,* 46 Cal.App.5th at p. 897 [" '[S]ection 425.16 provides no

51

mechanism for granting anti-SLAPP motions with leave to amend' "]; *Contreras v. Dowling* (2016) 5 Cal.App.5th 394, 411 [" '[a] plaintiff . . . may not seek to subvert or avoid a ruling on an anti-SLAPP motion by amending the challenged complaint . . . in response to the motion' "]; *Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.* (2004) 122 Cal.App.4th 1049, 1055 [accord]; *Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068, 1073 [rejecting the notion that right to amendment should be implied].)

We see no compelling reason to depart from this well-established line of authority.

## DISPOSITION

The trial court order of March 12, 2024, is affirmed in part and reversed in part. The matter is remanded to the trial court with directions to modify its order by granting the Code of Civil Procedure section 425.16 special motion to strike with respect to the following additional nonactionable and/or unsubstantiated allegations:

Paragraph 90: Remini was "abusive to her mother and daughter";

Paragraph 91: Remini "has no morals" and "only wanted her name in the news";

Paragraph 115: "Leah Remini: A One-Woman Hate Machine" and "Leah Remini Told Dying Sister 'Get Charity Care,' Family Says";

Paragraph 119: Remini is an "unhinged religious bigot" and a "Disgrace to Women of Valor Everywhere";

Paragraph 120: Remini filed a "false police report and then attempt[ed] to extort Scientology";

Paragraph 120: Remini "abus[ed] family members, including her half-sister, Stephani, and father, George Remini";

Paragraph 120: "Leah Remini to Dying Sister: 'Get Charity Care' ";

Paragraph 127: Entirety of "tweet" by Phil Maasen;

Paragraph 136:  Remini uses "obscenity laced and abusive language to insult, defame and demean Scientologists";

Paragraph 148:  "Remini obviously agrees . . . 'it's not a big deal' to sexually abuse women";

Paragraph 150:  Twitter post stating:  "Another advertiser has cancelled their ads on People Puzzler—the . . . program hosted by antireligious bigot [Remini].  This marks the 5th advertiser to cancel Remini";

Paragraphs 137 and 142–145.

The trial court is further directed to modify its order insofar as it states that the following allegations from paragraph 91 of the complaint, which are not barred by the statute of limitations, are untimely:  that Remini "is a liar," that she "would not help to pay for [her father's] cancer treatments," and that she "ransacked her dying grandmother's apartment."  Moreover, Remini may not amend her complaint to avoid the subject order.

Except as herein stated, the order is affirmed.  The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



RICHARDSON, J.



GOORVITCH, J.


53